Filed 3/19/13  Fox v. Redevelopment Agency of the City of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RICHARD D. FOX et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>REDEVELOPMENT AGENCY OF THE CITY OF SAN DIEGO et al.,<br><br>    Defendants and Respondents. | D060410<br><br><br>(Super. Ct. No. 37-2010-00104545-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey B. Barton, Judge.  Affirmed.

In this appeal, appellants Richard D. Fox, Joseph L. Carter, Wayne M. Edwards, Linda Elwood and Alice R. Smith (collectively, Appellants) challenge the trial court's dismissal — for lack of ripeness — of their action seeking declaratory relief and a writ of mandamus against the (1) Redevelopment Agency of the City of San Diego (the Redevelopment Agency); (2) the City of San Diego (the City); and (3) the Centre City

Development Corporation (CCDC) (collectively, Respondents).[1] Appellants sought

relief on the premise that a law passed by the Legislature removing the dollar limit on the

receipt of tax increment revenue that the Redevelopment Agency could receive from the

Centre City Redevelopment Project Area (the Project Area) (Health & Saf. Code,

§ 33333.14) was enacted in violation of certain provisions of the California

Constitution.[2]

As we will explain, the trial court properly dismissed the lawsuit on the basis that

it is not ripe for adjudication.  Accordingly, we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

This case involves the Community Redevelopment Law (CRL) (§ 33000 et seq.).

Until the CRL was amended in 2011 to dissolve all redevelopment agencies and bar cities

and counties from creating any new redevelopment agencies (*California Redevelopment

Assn. v. Matosantos* (2011) 53 Cal.4th 231, 250, 270 (*Matosantos*); §§ 34166, 34172),

"[c]ities and counties [could] establish a redevelopment agency to promote economic

development within a designated area.  ([] §§ 33100, 33101, 33120, 33131.)  Once

established, a redevelopment agency [was] a separate legal entity from the city or county

---

[1]     As we will explain below (see fn. 7, *post*, and surrounding text), the
Redevelopment Agency was dissolved on February 1, 2012, after this appeal was filed,
and the City was designated as its successor agency.

[2]     Unless otherwise indicated, all further statutory references are to the Health and
Safety Code.

2

that created it." (*City of Scotts Valley v. County of Santa Cruz* (2011) 201 Cal.App.4th 1, 18-19.)

A redevelopment agency was authorized to "prepare and carry out plans for the improvement, rehabilitation, and redevelopment of blighted areas." (§ 33131, subd. (a).) "Redevelopment agencies generally [could not] levy taxes. [Citations.] Instead, they [relied] on tax increment financing . . . . [Citations.] Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) [were] allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount — the tax increment created by the increased value of project area property — [went] to the redevelopment agency for repayment of debt incurred to finance the project." (*Matosantos*, *supra*, 53 Cal.4th at pp. 246-247.) In general, "[t]he only limit on the annual increment payment received [was] that it [could] not exceed the agency's *total* debt, less its revenue on hand. (§ 33675, subd. (g).) Once the entire debt incurred for a project [was] repaid, all property tax revenue in the project area [was] allocated to local taxing agencies according to the ordinary formula. (§ 33670, subd. (b).)" (*Id.* at p. 247.)

Redevelopment plans adopted after October 1, 1976, but before January 1, 1994, were required to contain a "limitation on the number of dollars of taxes that may be divided and allocated to the agency pursuant to the plan." (§ 33333.4, subd. (g)(1).) The amount of the dollar cap could be raised by amendment of the redevelopment plan by the redevelopment agency, following required procedures, including preparation of a report

3

describing and identifying the remaining blight in the project area and why additional debt is necessary to address it. (§§ 33333.4, subd. (g)(1), 33354.6.)

The redevelopment plan at issue in this case is the "Redevelopment Plan for the Centre City Redevelopment Project" (the Plan), which was adopted in 1992 and was administered by the Redevelopment Agency.[3] (See *Shapiro v. Board of Directors* (2005) 134 Cal.App.4th 170, 174-175 (*Shapiro*).) Because the Plan was adopted prior to January 1, 1994, it was subject to the requirement set forth in section 33333.4, subdivision (g)(1) that the Plan provide for a dollar cap on the tax increment from the Project Area that could be allocated to the Redevelopment Agency. As pled in the operative complaint and petition (the complaint), pursuant to the Redevelopment Agency's last amendment to the Plan made in 2007, the tax increment cap for the Project Area was $2,894,000,000. However, according to the complaint, the Redevelopment Agency was not expected to incur debt for the Project Area that would exceed the cap for approximately 10 more years. Therefore, for the next 10 years the Redevelopment Agency would have no need to receive tax increment payments exceeding the $2,894,000,000 cap.

In October 2010, the Legislature enacted section 33333.14, which lifted the tax increment cap applicable to the Plan. Section 33333.14 provides:

---

[3] The Redevelopment Agency carried out its redevelopment activities in downtown San Diego through CCDC, a nonprofit public benefit corporation established by the City. (*Shapiro*, *supra*, 134 Cal.App.4th at pp. 174-175.)

4

"(a)     The Legislature hereby finds and declares that the Redevelopment Agency of the City of San Diego's Redevelopment Plan for the Centre City Redevelopment Project, as approved and adopted on May 11, 1992, by the City Council of the City of San Diego by Ordinance No. 0-17767, as amended, contains an unrealistically low dollar limit on the receipt of tax increment.  The Legislature further finds and declares that this limit severely restricts the ability of the Redevelopment Agency of the City of San Diego to address conditions of blight which remain within its Centre City Redevelopment Project.

"(b)     Notwithstanding any other law to the contrary or any redevelopment plan previously adopted by the City of San Diego, commencing on the effective date of this section and in each fiscal year thereafter until the expiration of the time limit on the receipt of taxes and repayment of indebtedness set forth in the redevelopment plan adopted by the City of San Diego for its Centre City Redevelopment Project pursuant to subdivision (b) of Section 33333.6 and other applicable statutes, the dollar limit on the receipt of tax increment for the Centre City Redevelopment Project is eliminated, and the Redevelopment Agency of the City of San Diego may receive tax increment revenue from the Centre City Redevelopment Project without a dollar limit."

Appellants, who allege that they are "lower income residents" of the City and the neighborhoods covered by the Project Area, filed this lawsuit in November 2010 to challenge the validity of section 33333.14.[4]  The complaint alleged that section 33333.14 was invalid because it was enacted in violation of several procedural and substantive requirements set forth in the California Constitution.  The complaint attacked the procedure by which section 33333.14 was enacted, alleging that it (1) was a special

---

[4]     Appellants took the position in the trial court that, as lower income persons interested in the availability of low income housing, they had standing to bring this action because the Agency would purportedly take certain steps favorable to low income housing in the event the tax increment cap was reached.  The Agency disputed that assertion and raised Appellants' lack of standing as an additional ground for demurrer.  As it is not necessary to our decision, we do not discuss whether — in light of the applicable provision of the CRL — Appellants have standing to bring this action.

statute in violation of article IV, section 16(b) of the state Constitution; (2) violated the single subject rule of article VI, section 9 of the state Constitution; and (3) was not passed in accordance with the requirements in article IV, section 8 of the state Constitution regarding the timing of votes on legislation and the passage of urgency statutes. The complaint attacked the substance of section 33333.14 on the ground, among others, that it violated (1) the state Constitution's due process and equal protection clauses; (2) Proposition 1A (Cal. Const., art. XIII, § 25.5); and (3) Proposition 22 (Cal. Const., art. XIII, §§ 24(b), 25.5(a)(7)). The complaint sought two forms of affirmative relief. First, it sought a declaration that "the Defendants have violated the [CRL] and the California Constitution" and that "[s]ection 33333.14 is unconstitutional." Second, it sought a writ of mandamus ordering Respondents "to operate within the $2,894,000,000 cap unless and until [the Plan] is amended in accordance with the general statutes of CRL."

Respondents all demurred to the complaint on the ground, among others, that it failed to present a justiciable controversy in that it was not ripe. The ripeness argument focused on the complaint's allegation that the Redevelopment Agency had predicted that not for another 10 years would it reach the Plan's preexisting dollar limit of $2,894,000,000 on the receipt of tax increment for the Project Area.

6

The trial court sustained the demurrers with leave to amend. Appellants declined to amend the complaint.[5] The trial court granted the ex parte application brought by Respondents to dismiss the complaint, and it entered judgment against Appellants.[6]

After Appellants filed this appeal from the judgment of dismissal, the CRL was amended, as we have described above, to dissolve all redevelopment agencies. (§ 34172.) According to the City, and confirmed by documents we have judicially noticed,[7] the Redevelopment Agency was dissolved on February 1, 2012, and the City was designated as its successor agency as provided for in the amended provisions of the

---

[5]  In their briefing, Appellants refer to events occurring after the filing of the complaint, which they suggest may have some bearing on the ripeness issue. However, as Appellants expressly declined to amend the complaint and continue to take the position that the action is sufficiently ripe for adjudication based on the facts pled in the complaint, we do not look beyond the facts pled in the complaint to determine whether the trial court properly dismissed the action.

[6]  At the request of Appellants, the dismissal was *without* prejudice. Because the dismissal was *involuntary*, it is appealable despite being without prejudice. (*Topa Ins. Co. v. Fireman's Fund Ins. Companies* (1995) 39 Cal.App.4th 1331, 1336; *Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 665.)

[7]  We grant the City's unopposed April 6, 2012 request for judicial notice of City Council Resolution No. 307238 passed January 12, 2012, making the City the successor agency to the Redevelopment Agency. We also grant CCDC's unopposed request for judicial notice filed on April 5, 2012, regarding the 2010 operating agreement between CCD and the Redevelopment Agency. We deny Appellants' opposed request for judicial notice filed January 24, 2012, on the ground that the items at issue are not relevant to our decision. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [declining to take judicial notice of materials not "necessary, helpful, or relevant"].)

CRL. (§§ 34171, subd. (j), 34173, subd. (d)(1), 34176, subd. (a).) As the successor agency, the City now stands in the place of the Redevelopment Agency in this litigation.[8]

## II

## DISCUSSION

A. *Standard of Review*

"'On appeal from an order of dismissal after an order sustaining a demurrer, our standard of review is de novo, i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law.'" (*Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 650.) In reviewing the complaint, "we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable." (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814.) We may affirm on any basis stated in the demurrer, regardless of the ground on which the trial court based its ruling. (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324 (*Carman*).)

B. *The Requirement of Ripeness*

To determine whether the controversy presented in this action is sufficiently ripe, we first turn our attention to the doctrine of ripeness.

---

[8] We note that the City and CCDC have not chosen to pursue a dismissal of this appeal on the ground that it is moot due to the dissolution of the Redevelopment Agency. According to undeveloped statements in the parties' briefing, consideration of the mootness issue would likely require an understanding of the extent to which the City has agreed to honor obligations entered into by the Redevelopment Agency prior to its dissolution. As we will affirm the trial court on another justiciability ground, namely ripeness, we need not, and do not, address whether this appeal has become moot, and we have not requested that the parties brief the issue.

"'The concept of justiciability involves the intertwined criteria of ripeness and standing.' . . . 'Ripeness' refers to the requirements of a current controversy. According to the Supreme Court, 'an action not founded upon an actual controversy between the parties to it, and brought for the purpose of securing a determination of a point of law . . . will not be entertained.'" (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 59, citations omitted (*City of Santa Monica*).) "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 (*Pacific Legal Foundation*).) "'[A] controversy is "ripe" when it has reached . . . the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.'" (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 452 (*Vandermost*).) In part, the ripeness doctrine is based on the concern that "courts not be drawn into disputes which depend for their immediacy on speculative future events." (*Pacific Legal Foundation*, at p. 173.) An inquiry into ripeness "'requir[es] us to evaluate both the fitness of the issues for judicial decision and the

9

hardship to the parties of withholding court consideration.'" (*Id*. at p. 172, italics omitted.)

As relevant in light of the relief sought in the complaint, the ripeness requirement applies both to declaratory relief actions (*City of Santa Monica*, *supra*, 126 Cal.App.4th at p. 59) and to petitions for a writ of mandate. (*Vandermost*, *supra*, 53 Cal.4th at p. 452.) "'A demurrer may be sustained when the complaint shows on its face the claim is not ripe for adjudication.'" (*County of Santa Clara v. Superior Court* (2009) 171 Cal.App.4th 119, 131.)

C.      *This Action Is Not Ripe*

We now turn to an application of the "two-pronged test . . . used to determine the ripeness of a controversy:  (1) whether the dispute is sufficiently concrete so that declaratory relief is appropriate; and (2) whether the parties will suffer hardship if judicial consideration is withheld." (*City of Santa Monica*, *supra*, 126 Cal.App.4th at p. 64.)

"'Under the first prong, the courts will decline to adjudicate a dispute if "the abstract posture of [the] proceeding makes it difficult to evaluate . . . the issues["] [citation], if the court is asked to speculate on the resolution of hypothetical situations [citation], or if the case presents a "contrived inquiry [citation]."  Under the second prong, the courts will not intervene merely to settle a difference of opinion; there must be an imminent and significant hardship inherent in further delay.'" (*City of Santa Monica*, *supra*, 126 Cal.App.4th at p. 64.)

10

We first examine whether the dispute is sufficiently concrete. The gist of the relief sought by the complaint is a ruling (either in the form of declaratory relief or a writ of mandamus) that because section 33333.14 is unconstitutional, the Redevelopment Agency is required to follow the previous statutory requirements for amending the Plan when it wants to obtain tax increment dollars exceeding the preexisting dollar limit of $2,894,000,000. However, as the complaint alleges, the preexisting dollar limit will not be reached for 10 years.[9] Therefore, applying the first prong of the ripeness inquiry, the complaint presents nothing more than a dispute over the constitutionality of section 33333.14 that arises in an *abstract posture*, based on a *hypothetical situation* that will become relevant only at some point at least 10 years in the future, *if* the current tax increment cap is reached at that time. Appellants implicitly concede the abstract nature of the dispute by admitting that the City has not even taken a position on whether section 33333.14 is constitutional and whether it would eventually proceed under the statute to exceed the preexisting dollar limit of $2,894,000,000. Contrary to Appellants' suggestion, we will not "*presume* that [the City] has acted or intends to act pursuant to the unlimited authority granted it by section 33333.14."[10] (Italics added.)

---

[9] Although the issue is beyond the facts pled in the complaint for the purposes of demurrer, an obvious question is whether — in light of the dissolution of the Redevelopment Agency in February 2012 — the preexisting dollar limit of $2,894,000,000 will *ever* be exceeded, as opposed to in 10 years.

[10] Much of Appellants' briefing is directed at attempting to show a flaw in the reasoning of the trial court's order sustaining the demurrers, in that the trial court pointed out that the Redevelopment Agency had not yet voted to amend the Plan to exceed the former tax increment cap of $2,894,000,000. Appellants argue that the trial court

11

Turning to the second prong, Appellants present no argument that "the parties will suffer hardship if judicial consideration is withheld." (*City of Santa Monica*, *supra*, 126 Cal.App.4th at p. 64.) Indeed, based on the complaint's allegations, any harm to the Appellants would occur 10 years from now, if ever. There is no reason that this action could not have been brought at the time that the Redevelopment Agency indicated that it was going to exceed the preexisting dollar limit of $2,894,000,000 without amending the Plan. As the complaint does not establish "'imminent and significant hardship inherent in further delay,'" this matter is not ripe. (*Ibid*.)

Appellants argue that even if this action fails to satisfy the requirements for ripeness, we should still require the trial court to adjudicate this action because it presents a matter of significant public interest. Appellants' argument is contrary to established law. The significant public interest of an action does not alleviate justiciability requirements. "It is not sufficient that the issues encompassed . . . involve a sizeable public interest. . . . '[W]ithout proper grounds for justiciability, the court would be rendering an improper advisory opinion.'" (*City of Santa Monica*, *supra*, 126 Cal.App.4th at p. 66.) Appellants quote our Supreme Court's general statement in

misunderstood the issue because — after the enactment of section 33333.14 — no amendment to the Plan would be required to exceed the former cap of $2,894,000,000. Only an increase in the debt associated with the Project Area was required to exceed the cap. The language used in the trial court's order may have created some confusion, but as we read the order — regardless of the terminology — it focuses on the same fundamental ripeness concern that we describe here, namely that the complaint did not plead that the Agency had taken any steps to exceed the former cap of $2,894,000,000. More fundamentally, Appellants' focus on the trial court's logic is unavailing because we do not review the trial court's reasoning; instead we conduct a de novo review and may affirm on any basis asserted in the demurrers. (*Carman*, *supra*, 31 Cal.3d at p. 324.)

12

describing the doctrine of ripeness that "the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question." (*Pacific Legal Foundation*, *supra*, 33 Cal.3d at p. 170.) However, Appellants take this statement out of context. It was not made in the context of establishing a public interest exception to the ripeness doctrine. Instead, the statement specifically mentions the requirement of a "*concrete dispute*[]" (*ibid*., italics added), and introduces a discussion of the same ripeness requirements that we have discussed and applied above, namely identification of a sufficiently concrete dispute and a showing that the parties will suffer hardship if the issue is not decided. (*Id*. at pp. 170-172.)

Thus, under controlling law, regardless of Appellants' belief that this action presents an issue of public interest, it was properly dismissed on the ground that it does not present a dispute that is ripe for adjudication because it does not meet the applicable requirements.

DISPOSITION

The judgment is affirmed.

                                                                    IRION, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.

14